**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA**

| | |
|---|---|
| In re<br><br>**KENNETH R KRAUS**, and<br>**DONNA L KRAUS**,<br><br>    Debtors. | Case No.  **01-43609-7** |
| **JAMES KRAUS, PATRICIA KRAUS,<br>DEBRA PURTLE**, and **D-K RENTALS &<br>CONTRACTING, INC.**,<br><br>    Plaintiffs.<br><br>-vs-<br><br>**KENNETH R KRAUS** and **DAVID J<br>KRAUS, JR**,<br><br>    Defendants. | Adv No.  **07-00034** |

# MEMORANDUM  OF  DECISION

At Butte in said District this 20th day of June, 2008.

1

This adversary proceeding involves a family dispute[1]. Plaintiff Patricia Kraus ("Pat"), who is the mother of co-Plaintiff Debra Purtle ("Debra"), Debtor/Defendant Kenneth R. Kraus ("Ken") and Defendant David J. Kraus ("David"), seek judgment quieting title to approximately 45 acres of real property in Cascade County, Montana, on which Pat and Debra reside, and personal property, all of which is owned in the name of an involuntarily dissolved Montana corporation, the co-Plaintiff D-K Rentals & Contracting, Inc. ("D-K Rentals"), and seek damages for emotional pain and suffering and attorneys fees and costs. Defendants oppose Plaintiffs' claims for relief and counterclaim to award Ken and David each fifty percent (50%) of the real and personal property, and in addition seek an accounting for the property and damages for rent and conversion of real and personal property. Trial of this cause was held at Great Falls on March 14, 2008. Pat, Debra, David and Ken all appeared and testified, and exhibits were admitted[2].

At the conclusion of the parties' cases-in-chief the Court took the matter under advisement after first holding that the subject real property is owned in the name of D-K Rentals based on Ken's admission at trial that a quitclaim deed which he recorded is invalid. After review of the record and applicable law, this matter is ready for decision. For the reasons set forth below, Judgment will be entered against the Defendants quieting title in the real and personal property of the dissolved corporation in the name of Debra Purtle, but dismissing Plaintiffs' claim for attorney fees and costs and emotional distress, and dismissing all of

---

[1] Plaintiff James Kraus, Pat's spouse and father of Debra, Ken and David, is deceased.

[2] The Exhibits ("Ex.") admitted into evidence are Plaintiffs' Ex. 1, 3, 4, 10, 12, F, G, H-1-2, J, K, and O; David's Ex. 2, 5, A, B, L-61 through -66, and P; and Ken's Ex. D, I, M, N, S, U, and V.

Defendants' counterclaims.  This Memorandum of Decision includes the Court's findings of fact and conclusions of law pursuant to FED. R. BANKR. P. ("F.R.B.P.") 7052 (applying FED. R. CIV. P. 52) in adversary proceedings).

The Final Pretrial Order submitted by the parties and approved by the Court on March 7, 2008, provides that this Court has jurisdiction of this adversary proceeding pursual to 28 U.S.C. § 1334, and that this is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (E).  In addition, at trial the Court asked Defendants whether they consent to this Court entering a decision on any non-core proceedings, and both Ken and David consented on the record.  Plaintiffs Pat and Debra both appeared and testified at trial, and Plaintiffs were represented by attorney Lisa Swan Semansky ("Semansky") of Great Falls, Montana.  Ken appeared and testified, represented by James A. Donahue ("Donahue") of Great Falls.  David appeared and testified, represented by attorney Kirk D. Evenson ("Evenson") of Great Falls.  David's spouse Charlotte Kraus ("Charlotte") testified.  Brett Lund ("Lund") of Rocky Mountain Crime Consultants testified as a handwriting expert.  Attorney William O. Bronson ("Bronson") and certified public accountant ("CPA") James R. Koontz ("Koontz"), also testified.

## FACTS

The following agreed facts are set forth in the Pretrial Order at pages 3-4:

1.  All named parties in this action are residents of Cascade County, Montana.

2.  Plaintiff, James Kraus, whose legal name is David James Kraus ["James"] died on February 20, 2007.

3

3.  The real property at issue is particularly described in the amended complaint[3] and located in Cascade County, Montana.  It was transferred from Plaintiffs James and Patricia Kraus to the corporation D-K Rentals & Contracting, Inc., in 1988.

4.  Any personal property at issue is located in Cascade County, Montana.

5.  The corporation, D-K Rentals & Contracting, Inc. ["D-K Rentals"] was incorporated in Arizona in 1985, authorized to do business in Montana in 1985, and involuntarily dissolved in Arizona by the Arizona Secretary of State.  D-K Rentals & Contracting, Inc., was incorporated in Montana on August 16, 1993, and involuntarily dissolved by the Montana Secretary of State in 1994.

6.  On June 30, 2005, Defendant David Kenneth R. Kraus quitclaimed the real property in this lawsuit to himself by executing a quit claim deed as the purported president of D-K Rentals. The deed was recorded with the Cascade County Clerk and Recorder as Document R0107447.[4]

Additional and supplemental facts were developed by the testimony and exhibits admitted at trial.  Ex. G are survey maps showing the subject real property located off of Montana Highway 226.  All of the parties live[5] in homes on or near the real property[6].  Debra testified that

---

[3]The description is found at "Exhibit 1" attached to the amended complaint found at Docket No. 2 in the case docket for this adversary proceeding, attachment No. 14 "Amended Complaint."  The extensive metes and bounds description is hereby incorporated by reference as though set forth in full herein, and shall be referred to as "the real property."  The legal description identified above will be attached to the Judgment entered in this adversary proceeding.

[4]Ken admitted at trial that the quitclaim deed is invalid and that the real property belongs to D-K Rentals.

[5]Pat still lives in the house she shared with James.  Debra lives with Pat.

[6]Ex. G at page 3 notes that David and Ken own their own lots.

James refused to pay property taxes on certain parcels of the real property owed to Cascade County, and that issue persisted over several years.

Pat and James were married for 57 years. Ken, David and Debra are their children. James was a skilled mechanic who bought equipment, repaired it and put it to use in his business enterprises including road contracting. However, Pat testified that James was headstrong, and others described him as foolish with respect to safety[7]. David testified that he was cleaning up James' messes since he was young.

Ken testified that James put him to work at a young age in James' construction company operating a D-8 Caterpillar, and that he worked in construction whenever he was not in school. David testified that he operated heavy equipment and provided labor for James. In the early to mid 1980's James was engaged in subcontractor work in Arizona.

D-K Rentals was formed in 1984 or 1985, and named by combining "David" and "Kenneth." D-K Rentals was in the business of dirt excavation, crushing gravel, and surfacing and building roads. David testified that D-K Rentals incorporated in Arizona because of tax advantages, and they were finishing up a road surfacing job in Arizona. Ken and Debra lived in Arizona, and David resided there full or part time for 5 years before returning to Montana.

Debra testified that when D-K Rentals was first incorporated Ken was its president,

---

[7]Bronson represented D-K Rentals in a lawsuit involving personal injury and property damage caused by James while he was driving a corporate vehicle. Ken described James as frequently doing foolish things, such as illegally transporting a piece of over-wide D-K Rentals equipment, a "chipper", with a truck in 1986 or 1987, which resulted in the death of a bicyclist who was struck in front of his family. David testified that he and Ken tried to stop James from leaving a job site with the over-wide chipper without pilot vehicles, but James drove off. Even after that accident, both Ken and David testified, James continued to engage in foolish actions and caused accidents. It was not discovered in the lawsuit that D-K Rentals owned the chipper.

David was vice president and she was the secretary treasurer.  No share certificates were issued for D-K Rentals.  David testified that he and Ken each owned 45 percent of the shares of D-K Rental stock from its incorporation, and that Debra owned 10 percent.  Debra testified that she did not contribute capital to D-K Rentals, but that neither did Ken and David because all the capital was contributed by James and Patricia.  Pat testified on cross examination that she has never had an ownership interest in D-K Rentals.

Debra testified that the corporation held meetings, but not regularly.  She described D-K Rentals as a family corporation in which the money earned benefitted all family members.  Pat testified that times occurred when she and James both worked for D-K Rentals without pay, and later she was paid $150 per week while working 12 hours per day for D-K Rentals.  David described James as more an advisor than an employee.

Debra testified that David signed all the D-K Rentals corporate tax returns which she saw, that David had possession of all the corporate books and ledgers, and that some corporate documents in their office were thrown away during a remodel.  Pat testified that she disclosed all corporate records in her possession and produced them.  Bronson testified that he provided legal services to D-K Rentals.  Koontz performed accounting services for D-K Rentals, for James and Pat personally, and for Ken.

Debra testified that Pat and James both worked for D-K Rentals for several years without compensation.  David testified that Debra took care of D-K Rentals' paperwork and Arizona taxes. Pat and Ken testified that Pat worked for D-K Rentals as office bookkeeper[8], secretary and

---

[8]Ken testified that Pat was in charge of D-K Rentals' records, and that he did not review them.

parts chaser in charge of the yard from 1988 to 1993. Ken operated equipment in the field and was a supervisor for D-K Rentals.

Debra admitted that she filed some of the corporate reports required by law at first, but that as time went on she failed to file reports when due. While D-K Rentals was operating in Arizona, Debra testified, she had signatory rights to the corporate bank account but she relinquished those rights. After the State of Arizona dissolved D-K Rentals for failure to file an annual report, Ex. P, on January 10, 1987, Debra testified that she stayed in Arizona to wrap things up, and that nothing was done to reinstate D-K Rentals in Arizona because its operations had moved to Montana.

D-K Rentals was incorporated in Montana with the same name and federal tax ID number as when it operated in Arizona, 81-0428279. Koontz testified that the stock in D-K Rentals in Montana was owned by Ken, David and Debra. Pat testified that she and James owned no stock in D-K Rentals prior to 1993.

Pat testified that the corporate bank account at first had David's name on it, and later Ken's name was added. Ken testified that he, David and Pat were signatories on the account, but he admitted that Debra's name "possibly" was on the account. Debra testified that, at first, she did not have authority to write corporate checks on the D-K Rentals' corporate account in Montana, but later recalled that she did sign checks for purchasing and later for payroll. David testified that early on he and Ken were issued corporate credit cards, and that later Pat and Debra got corporate credit cards and ran up more than $16,000 in credit card debt.

Pat admitted that she could have signed James' names to documents, but could not recall any instances and testified that she usually does not do things like that. Pat admitted that she

could have signed payroll checks in Dave's or Ken's names, but only if they called her and told her to.  Ken disagreed that Pat signed checks only with permission.

James and Patricia filed a Chapter 7 bankruptcy case, No. 87-40690-7, on October 13, 1987.  They received a discharge and the case was closed on October 6, 1989.  D-K Rentals purchased the subject real property at issue, and personal property and equipment, from James and Patricia's bankruptcy estate, after D-K Rentals had moved its operations to Montana.  David testified that D-K Rentals first purchased a few pieces of James' equipment, and then the lienholder offered to sell it all their parents' assets.  Ex. B is the cashier's check dated February 17, 1988, in the amount of $140,000.00 paid by D-K Rentals to purchase James and Patricia's assets from their estate.  David testified that the $140,000 came from money earned by D-K Rentals on jobs.  Ex. L-61 through L-66 is the Order approving the sale and a list of assets.

Pat testified that she talked to Ken and David about letting her and James continue to live on the real property, and that they reached a verbal agreement that she and James could continue to live in their house.  She described the substance of the agreement as that she and James could continue to live in their house, and the corporation would pay for the taxes and upkeep.  Pat testified that there were no conditions that she and James maintain the house, and that the verbal agreement did not to her knowledge ever change.

Ken testified that he and David allowed James and Pat to stay in their house, but on conditions that James and Pat pay for the maintenance, upkeep and property taxes[9].  Ken testified that they all talked about it, and finally Ken and David decided they had to put something in

---

[9]Ken explained that the agreement did not require James and Pat to pay rent because they were family.

8

writing to establish some control[10].  James and Pat continued to live in a house on D-K Rentals'

real property between 1988 and 1993.  Debra testified that there was no formal agreement that

Pat and James could live in their house, but rather only their open-ended understanding that their

parents would always be taken care of.

Pat did not agree with David's attorney Evenson's suggestion that animosity existed

between her and James, and David and Ken.  She testified that David and Ken were unhappy and

discontented with construction in general, not just against family members.

In 1989 Ken purchased an automotive and performance parts store, but he continued to

work finishing D-K Rentals' contracts until 1991.  Charlotte testified that in 1990 and 1991

David was working 40 hours and 15 to 20 hours overtime each week for D-K Rentals, but was

not being paid.  She testified that Ken was working the same hours without pay, and that she and

David lived on Charlotte's income and took turns buying groceries with Ken.  She testified that

David brought $0 home from D-K Rentals in 1990, and received approximately $45,000 from D-

K Rentals in 1991.  Pat did not agree that David and Ken were not paid their wages regularly.

She admitted that 1 or 2 paychecks may have been missed, but that their W-2's would reflect their

wages[11].

David testified that D-K Rentals had some good years, but he and Ken became

disgruntled when James used D-K Rentals' funds, personnel and equipment for his hobbies,

including buying gold and gold mining equipment, and David told James that D-K Rentals could

not afford to pay for work on James' gold mining equipment.  Ken testified that he became

---

[10]That agreement did not appear in writing for several years, Ex. A, and is disputed.

[11]David's and Ken's W-2 forms were not offered.

dissatisfied with D-K Rentals when it could not make payroll and could not afford to have the proper kinds of equipment for its jobs.  When asked what the problem was Ken answered that his parents were spending money on things unrelated to D-K Rentals.  David testified about the credit problems D-K Rentals had with its bank as a result of Debra's and Pat's use of the corporate credit cards.  In addition Ken testified that reports and permits required by the Department of Transportation were not being filed on time by Pat.  He could not make changes, he testified, because "how do you fire your mother?"

Ken testified that he spoke with David about quitting and they decided to "pull the plug" and sell off D-K Rentals' equipment, and pay its bills.  In early 1991, David testified, they finished a D-K Rentals' contract in Idaho and moved its equipment back to Montana.

**1991 Equipment Sale.**

D-K Rentals sold its corporate equipment[12] in June 1991, including equipment purchased from Patricia's and James' bankruptcy estate.  Pat found an auctioneer to conduct the sale.  Debra testified that the 1991 sale of D-K Rentals' equipment resulted in slightly more than $400,000 gross, and that after commissions the net proceeds were approximately $300,000, which were used to pay the corporation's debts.  Debra testified that she was not in Montana during the sale, but she believed that all the corporation's debts were paid off, and she was sure there was some money left over.  David testified that the sale netted approximately $370,000 which was used to pay the bank, secured creditors and the auctioneer.  David testified that he and Ken got their

---

[12]Not all of the corporate equipment was sold.  Ex. D at page D-5 lists a Terex 72-31 wheel loader which Pat testified she sold in February 2007.  Pat testified that the loader was junk in 1991, and James repaired it at his own expense.  The Terex wheel loader is not listed on the list of equipment sold to D-K Rentals from their bankruptcy estate on Ex. L-66.

wages out and there was $200,000 left over.  When asked what happened to the remainder David testified that he does not know where the $200,000 went, but then stated that a large amount went to Debra as a loan, and a lot was taken by James and Pat and used to buy cattle[13].  David testified that acrimony developed between the family members.

Debra testified that Ken and David negotiated a settlement of their interests with D-K Rentals' corporate counsel Bronson and CPA Koontz, and that Ken and David received a cash settlement of their interests from the sale proceeds, which is documented in financial statements and Form 1099's.  Debra admitted that she was not present during the negotiations.  Pat testified that David and Ken were paid for their shares in D-K Rentals, and that they received $40,000, plus their pickup trucks free and clear, prepaid life insurance and their tools.  Debra testified that the sale of corporate equipment allowed the corporate debt to be paid, and to pay her brothers, and the rest was turned over to Debra and their parents.  Debra testified that D-K Rentals did a little business after the sale, but mostly just finished loose ends because there was no corporate business left to be done.  Pat testified that they tried to keep income coming in but there was no longer any business or income from D-K Rentals.

Debra testified that her brothers wanted to go their own way, and that they walked away from D-K Rentals.  Debra testified that she recalls David stating in 1991: "I am done"; "I am going my own way"; the "folks are set"; and that she spoke with David at the sale and he said he "was glad it was being done and he was moving on."

---

[13]Ex. O at page O-2 shows an entry dated 12/13/91 to Cerek Ranch for cows in the amount of $11,500.  When asked about that entry on cross examination Pat admitted that she used D-K Rentals funds to purchase cows, but that they used the proceeds from the sale of those cows to pay for maintenance on the real property.

Koontz was a CPA and provided accounting services for James and Pat, for D-K Rentals, and also for Ken.  Koontz testified that he discussed with David and Ken in 1991 the liquidation of D-K Rentals' assets and whether to gift their D-K Rentals stock.  He testified that David and Ken had operated D-K Rentals successfully and wanted to go out on their own, and that after selling the corporate equipment they wanted to go on to the next step.  Koontz testified that when David and Ken went their own way their stock interests in D-K Rentals were to be gifted to their parents James and Pat, and to Debra.

Under questioning by the Court, Koontz testified that if David and Ken had given their shares in D-K Rentals to Jim and Pat they would have had to sign their shares over, which would have been a gift requiring the donors to file gift tax returns.  Koontz explained that he did not file gift tax returns for David and Ken, but that there would have been no gift tax due anyway because of the annual and lifetime exclusions, presuming the parties did not use up the unified gift tax credit.

Pat testified that there was supposed to be a gift of the real property to her and James, but that no gift took place in writing although she saw a reference in Bronson's correspondence that it would be gifted.  Ken testified that he never gifted the real property to James and Pat, and never filed a gift tax return regarding the property.  David testified that he never intended to gift his interest in D-K Rentals to Pat or to Debra.  No evidence exists in the record supporting a finding that a gift was made.

Koontz testified that one of the factors he discussed with Ken and David was income distribution resulting from the asset sale.  He testified that there was more than $200,000 cash in

12

D-K Rentals' bank account[14] and the real property remaining[15], and because the tax basis of the assets was low there would have been taxes due from the shareholders on the gain from any sale and distribution.  Based on the tax consequences, Koontz testified that he advised Ken and David not to liquidate the real property.  Pat testified that the attorney and accountant both advised them not to transfer the real property to her, James and Debra because of the capital gains result, and that instead she and James were to be able to live in their house until their death, when it would go to Debra.

Koontz testified that his understanding of Ken's and David's intentions was that they were going off on their own and their parents would get the corporation[16].  Pat testified that David and Ken intended to resign and leave their interests in D-K Rentals, leaving Debra as its only officer.  Pat also testified that all the stock was to go to Debra based on her 10% share interest, and to Pat and James.  Debra testified that the parties agreed to put the corporation into an LLC in Debra's name with the intent to take care of James[17] and Patricia with the real property.

Ex. O is the general ledger for D-K Rentals for the period from 10/31/91 through 2/28/93,

---

[14]Koontz testified that all the income was from D-K Rentals' Montana operations and not from any operations in Arizona.

[15]The real property includes a shop, houses and a gravel pit which Koontz testified had a total value greater than its book value.

[16]Koontz testified that Ken and David did not tell him "per se" that their parents would receive the corporation, but that was his understanding.  After explaining the tax consequences to them, Koontz testified that he stated that it was a family affair and he had no further contact with them regarding D-K Rentals.

[17]She testified that James was experiencing health problems.

generated 5/21/93 and 5/24/93.  Pat testified that Koontz prepared Ex. O from checkbook invoices and bank statements which she delivered to him, and that Koontz entered the records on his computer and prepared Ex. J.  On December 13, 1991, Ex. O at page O-2 shows that a swather was purchased with D-K Rentals funds for $1,563.63.  Pat testified that it was used to cut hay, but on cross examination she testified that the swather was not used only for her and James' hay crop, but that the swather was purchased for James to use on a contract he had to mow barrow pits between Great Falls and Dutton.  On September 1, 1992, James purchased cattle for $14,375.00 with D-K Rentals funds.  Ex. O, pp. O-20, -21.  Pat testified that they purchased those cattle with the idea they would be sold and the profits used to pay corporate debts.

Ex. K is an income statement for D-K Rentals for the periods ending February 28, 1992, and February 28, 1993.  Koontz testified that Ex. K shows net income for the fiscal year ending February 28, 1992, in the amount of $86,298.73, and a loss of $13,835.14 for the year ending February 28, 1993.  Koontz finished preparing Ex. J, D-K Rentals' federal and state corporate tax returns for 1991, on May 28, 1993.  He testified that David and Ken knew the tax returns were due each year, but that they brought him the necessary information to prepare the returns for the years 1991 and 1992 in 1993.  Bronson testified that Ken and David did not want to sign the corporation's tax returns even though they were due, and that Ken and David wanted to get out of the corporation and have no further involvement.

**1993 – Incorporation of D-K Rentals in Montana.**

Debra[18] testified that the officers of D-K Rentals changed in 1993, when Bronson drafted new articles of incorporation which were filed on August 16, 1993, with the Montana Secretary of State. Ex. 2. Ex. 2 names Ken, Debra and David[19] as directors, Pat and Ken as incorporators, and names Pat as the registered agent with the registered office at 38 Eden Park Lane in Great Falls. David testified that he did not contact Bronson. Pat testified that she discussed with Bronson and Koontz how to keep the corporation intact and hold Ken and David harmless for any tax liability or other corporate liability, and they decided to keep the D-K Rentals intact.

Bronson testified that Pat contacted him about restoring the corporation into good standing, and that he spoke with her, Ken, and David. Bronson testified that D-K Rentals had been dissolved as an Arizona corporation, and that it had a certificate to operate in Montana which had also expired. Bronson looked into reestablishing D-K Rentals in Arizona, but testified that was too expensive and complicated because it was no longer doing any business in Arizona. Bronson testified that in his mind D-K Rentals Arizona and D-K Rentals Montana were the same entity. Bronson testified that corporate tax returns were due to be filed, but that Ken and David wanted no further involvement with the corporation and did not want to sign the corporate tax returns, while Pat and Debra wanted D-K Rentals to continue in business. Bronson testified that all he did was set up the corporation with the same structure and shares, Ex. 2, and then Ken and

---

[18]Debra testified that she was in Arizona and did not find out about the events in 1993 until later when Bronson and Koontz informed her.

[19]David testified that he is not on Ex. 2, but "David Kraus" is listed as a director on page 2 with an address of 1909 2nd St. South in Great Falls, a different address from Pat's address on page 3. Although James' first name is David, the only evidence on his address shows that he shared the house with Pat until his death.

15

David resigned.

**Ken's & David's Resignations from D-K Rentals.**

Pat testified that David came to her in September or October of 1993, after they had resigned and told her they wanted to be out of D-K Rentals and go their separate ways, but they wanted to be held harmless. Ex. 3 and 4 are Ken and David's resignations, respectively, from D-K Rentals. Ken testified that he spoke with David and they shared concerns about being officers of D-K Rentals. The corporation's equipment had been sold in 1991, and Ken testified that in 1993 the majority of the corporate property consisted of the real property and James' and Pat's house. Ken thought that his other business, the auto parts store, was at risk. He testified that he and David met with Koontz and Bronson about withdrawing from the corporation.

Bronson testified that he prepared Ex. 3 and 4. Ex. 3 and 4 are undated, and each provides in pertinent part: "I hereby resign from all director and officer positions with the corporation, pursuant to Sections 35-1-423 and 35-1-444, MCA. *I will have no further interest* or involvement in the corporation." Ex. 3,4. (Emphasis added). Bronson testified that Ex. 3 and 4 reflect David's and Ken's intent. Ken admitted that he signed Ex. 3, but testified that he never intended to give up his interest in the real property but rather intended only to get his name off of the corporation. David testified that his intention in signing Ex. 4 was "to get out of worry" and not let his father get out of control, but he answered "No" when asked if it was ever his intent to relinquish his interest in the value of D-K Rentals.

Debra testified that she never resigned as officer and director of D-K Rentals, and that no one ever questioned her about her 10% interest. Debra testified that she spoke with Koontz, who did D-K Rentals' accounting, and that Koontz told her that there was a tax problem and there was

no reason to transfer the real property out of the corporation. Debra testified that she left things alone to avoid the tax problems, and that in her mind after David and Ken resigned from D-K Rentals the real property was going back to their parents and Debra retained her interest.

Debra testified that she was not in Montana in 1993, and that she was unaware of D-K Rentals having any paying contracts at that time, but she had no problem if her parents wanted to submit a bid for D-K Rentals on a small gravel job. David testified that the real property included gravel which D-K Rentals crushed on the property, along with gravel from other sources.

Ex. 5 is a document signed by David and Ken entitled "Indemnification Agreement" dated 9/24/93[20], which Debra and Bronson testified was part of David and Ken's resignation process. Ken testified that corporate assets were being sold off and he did not want to get sued. David testified that he was getting out of the corporation and he was concerned about liability and that his parents were trying to take corporate property.

Bronson testified that he prepared page 1 of Ex. 5 and some of page 2, but that someone else typed in added language at paragraph (5). The first two recitals on page 1 of Ex. 5 state David's and Ken's "desire to withdraw from the corporation, *in their capacities as shareholders*, directors, and officers" and their "desire to have no further relationship of any kind with the corporation." (Emphasis added). Page 2 of Ex. 5 provides that D-K Rentals will indemnify and hold harmless David and Ken for any claims now or in the future against D-K Rentals. Paragraph 5 on page 2 of Ex. 5 is initialed by David and Ken and provides:

D-K Rentals & Contracting, Inc. agrees to indemnify and hold harmless David

---

[20]Koontz testified that he wrote in the date.

17

> Kraus and Ken Kraus, and their heirs, Personal Representatives, successors,
> assigns, agents, partners, and employees from all claims, actions, and demands
> that may arise from their actions in their capacities as officers and directors of the
> Corporation since its formation in 1985.  This indemnification shall preclude
> future officers and directors and shareholders of D-K Rentals & Contracting, Inc.
> from asserting any claims against David Kraus and Ken Kraus for actions by them
> as officers and directors and shareholders of the Corporation.

Bronson testified that David and Ken insisted on adding the language at paragraph 5 of Ex. 5,

because Ken wanted to be protected and held harmless for any claims against D-K Rentals.[21]

Bronson testified that Ken and David[22] added paragraph 5 and sent Ex. 5 back to him.

Ex. 5 is signed by David and Ken on September 24, 1993, but there is no indication that

they signed on behalf of the corporation, D-K Rentals.  The  signature page for Ex. 5 has a space

for a signature on behalf of D-K Rentals, but those lines are blank.  Bronson testified that Ex. 5

was part of Ken's and David's getting out of the corporation, and that he did not know who were

the corporate officers after 1993.  Ken testified that he signed Ex. 5 to get his name off of the

corporation and to be held harmless.

Koontz testified that he prepared David's personal tax returns after Ex. 5 was signed, but

did not discuss D-K Rentals any further with David or Ken after preparing D-K Rentals' tax

returns.  Bronson testified that after Ex. 2, 3, 4, 5, and 12 were completed on October 1, 1993, he

had no further contact with David and Ken regarding D-K Rentals[23].  Under questioning by the

---

[21]Paragraph 1 of Ex. 5, p. 2, is another indemnification provision, although not as specific
as paragraph 5.

[22]David testified that the added language on Ex. 5 was not his typing.

[23]Bronson represented Ken in a matter unrelated to D-K Rentals, and testified that he told
David and Ken to consult other counsel with respect to their individual rights.  With respect to
other corporate documents, Bronson testified, as he related in Ex. 12, that he was not asked to
prepare any.

Court, Bronson testified that Ex. 12 was the last letter comprising documents which were submitted to reinstate the corporation D-K Rentals.

Pat testified that she received Ex. 3 and 4 from the corporation's attorney Bronson, along with a cover letter, Ex. 12. Debra admitted that she was not present when Ken and David signed Ex. 3 and 4, but that Bronson told her they signed them. Bronson testified that he mailed Ex. 3 and 4 to David and Ken unsigned, and that they were returned to him by David and Ken with their signatures and he sent them to Pat. Debra testified that she received Ex. 12 from Bronson, with Ex. 2, Ex. 5, and "Letters of resignation signed by Ken and Dave" enclosed. Ex. 12 is dated October 1, 1993, and Bronson testified that Ken and David signed their resignation letters, Ex. 3 and 4, prior to October 1, 1993. Under questioning by the Court, Pat testified that she and James met with Debra about appointing new officers for D-K Rentals, and that a lot of corporate documents were destroyed.

Debra testified that Ken and David never resumed their roles as officers and directors of D-K Rentals after their resignations. Koontz testified that David and Ken had gone on to other employment and did not have anything left to do with D-K Rentals. Under cross examination Koontz testified that James and Pat had taken over ownership of D-K Rentals, but he admitted he does not have documents to support that.

Pat testified that she and James were not signatories to the corporate bank account and did not have access to corporate funds prior to Ken and David's resignations, and that after they resigned she went with Ken and David to the bank, took David's and Ken's names off the corporate bank account and added Pat[24].

---

[24]Pat testified that Debra's name was already on the corporate bank account.

After they resigned from D-K Rentals, Ken went to work at his Auto World store and David went to work as a construction superintendent for the county. Debra testified that there was no deed evidencing a transfer of the real property until Ken quitclaimed the property to himself several years later. Pat testified that the D-K Rentals' assets remained as they were after the 1991 sale until Ken signed the quit claim deeds to himself.

**Ex. "A".**

Ex. A is a copy of a disputed exhibit dated 10-15-93, which purportedly contains the signatures of David, Ken, James, Pat and Debra. David testified that he typed up Ex. A with Ken's help, and that Ex. A is a "last warning" to James, Pat and Debra to leave things alone and the consequences if they do not. Ken testified that he discussed Ex. A with David after David typed Ex. A up, and Ken[25] and David signed it. David then took Ex. A, and Ken testified that he has no idea whether David received it back from James, Pat or Debra.

Ken testified that his intent in Ex. A was to make sure that he was out of the corporation, D-K Rentals. Ken was concerned because his parents were using the house and property to build the gold mining operation, a cattle operation, and that they sold gravel from the corporate property. On cross examination David admitted that he did not object and he allowed his parents to sell gravel after 1993, but that he told them 3 or 4 years ago that it was not okay to take gravel. Ex. A allowed James and Pat to stay in their house without paying rent, Ken testified.

Ex. A begins by stating that D-K Rentals was owned equally by Ken and David[26]. Ex. A

---

[25]When asked whether he reviewed Ex. A, Ken testified that he has a reading disorder.

[26]This initial memo is misleading because David and Ken had weeks before the date of Ex. A resigned as shareholders, officers and directors of D-K Rentals in Ex. 5, and Ex. 3 and 4 in which each stated: "I will have no further interest or involvement in the corporation."

includes "Statements" and "Considerations" which follow in full:

STATEMENTS:

Debra Purtle acknowledges she paid herself with funds from D-K Az.  In doing so Debra realized an incredible amount of money for her 10% interest and for little or no work.  Debra has no right to make future demands on any assets belonging to D-K MT.

David Sr. [James] and Patricia acknowledge they have never owned any portion of D-K AZ.  Nevertheless they have compensated themselves lavishly with funds from D-K AZ. They too contributed little or no work.  David Sr. and Patricia will not make any future demands on assets belonging to D-K MT.

Patricia Kraus agrees to refrain from any and all future contact with corporate attorney, William Bronson, and corporate C.P.A., James Koontz.

David Sr. and Patricia and Debra will not sell, operate, use or rent out equipment, land, gravel, buildings or any other assets belonging to D-K MT, the only exception being the terms stated under "CONSIDERATIONS".

In addition to our Indemnification Agreement that we had C.P.A. James Koontz prepare for D-K AZ, David Jr. and Kenneth will be held harmless from any and all liabilities that may arise as a result of David Sr.'s, Patricia's and/or Debra's past or future activities[27].

David Sr., Debra and especially Patricia will desist with their efforts to manipulate ownership[28] of D-K MT to themselves in part or whole.

CONSIDERATIONS:

Kenneth and David Jr. will not pursue criminal charges for misappropriation of D-K AZ funds against David Sr., Patricia or Debra provided they all abide by the terms in this agreement.

David Sr. and Patricia will be allowed to reside at 38 Eden Park Lane, an asset

---

[27]David testified that, notwithstanding the earlier indemnification agreement, Ex. 5, he was concerned because James was raising cattle and had caught himself on fire and almost burned himself to death twice using gas and diesel fuel in a homemade heater.

[28]David testified that he did not want any further attorney involvement in D-K Rentals, and wanted James to stop asserting "social ownership" by stating that he owned the real property.

belonging to D-K MT for a length of time to be determined by Kenny and David Jr.  For this consideration David Sr. and Patricia agreed to maintain said house and lot and pay any and all property taxes in full as they come due.  Additionally, David Sr. and Patricia will be allowed to continue raising cattle on the land also owned by D-K MT.  For this consideration David Sr. and Patricia agree to maintain the balance of D-K MT land and buildings and to pay any and all property taxes in full as they come due.  Failure to comply, in part or whole, with any of these considerations or statements may result in a 24 hour notice of eviction to be served and executed with or without the Cascade County Sheriff's Dept. during any month, week or day of the year.  It will be at Kenny's and David Jr.'s discretion to deem what constitutes a failure to comply and begin eviction proceedings.  David Sr. and Patricia agree with this.

Kenneth will maintain contact with David Sr. and Patricia on a frequent basis. Kenneth will be allowed access into the house at 38 Eden Lane.

The signing of this document forges a binding agreement that supercedes any and all prior proposals, statements, documents and/or agreements to the contrary.

After the "Considerations," Ex. A refers to Attachments One and Two, comprising of a list of equipment and a map showing the real property owned by D-K MT.  However, Ex. A does not include any attachments.  David testified that the attachments were on the original and he did not get them back.

Ken testified that he signed Ex. A in David's presence, but he did not pay any attention to the date.  David and Ken testified that David gave Ex. A to James, told James to read it and to take it to Pat and Debra.  David testified that James did not sign Ex. A in front of him, and that a week later David received two copies back with all the signatures.  David testified that he did not know where the original of Ex. A is, but he noted that there are records in a shed next to the house[29].

---

[29]The case docket in this adversary proceeding does not reflect any discovery dispute regarding Ex. A, and specifically Defendants did not file a motion for inspection of property under Fed. R. Civ. P. 34(a)(2) (applicable in adversary proceedings under F.R.B.P. 7034).

Ken testified that he was not privy to the language in Ex. A regarding Debra's use of corporate credit cards, but he testified that Debra purchased saddles with a D-K Rentals credit card which were not used for D-K Rentals' business. David testified that Debra charged dinners, saddles, gasoline and other charges on her D-K Rentals credit card which were not for D-K Rentals. David admitted that Debra had 10% of D-K Rentals, but he testified that she already got what she had coming.

Ken testified that Ex. A permitted James and Pat to live on the property as long as it did not jeopardize Ken and David. He testified that Debra and his parents did not complain to him about Ex. A, and that they complied in part with Ex. A by keeping the house up and making improvements, although they did not comply fully. David testified that the agreement to allow James and Pat to live in their home began long before the sale, but that there was never any understanding that they could live there for the rest of their lives.

Ken testified that he did not intend for the final clause of Ex. A, which provides that it supersedes all prior agreements, to undo Ken's resignation as an officer or director of D-K Rentals in Ex. 3, and that he misunderstood that part. He also testified that he did not intend for Ex. A to undo the indemnification agreement, Ex. 5.

Debra and Pat both testified that they did not sign Ex. A. Debra testified that she never saw Ex. A until after her deposition was taken in January 2008. She testified that she read Ex. A twice and there was "absolutely no way on this earth anybody would've signed this." No evidence exists in the record that James, Pat or Debra signed Ex. A other than the signatures on page A-2. Although she admitted that her signature is available from other documents, Debra testified that she could not tell whether her purported signature on Ex. A is her signature taken

23

off of some other document.

Pat also denied signing Ex. A, and she testified that she never saw it before.  She denied that her purported signature on Ex. A is her signature, but she recognized her handwriting and admitted that it looks like her signature.  When challenged on cross examination about her memory of Ex. A Pat testified that she is "absolutely sure."  She testified that James did not ever show her Ex. A, and when asked if she knew what James' reaction to David giving him Ex. A would have been, Pat answered that James would have ripped it up and throw it in his face.  Pat testified that Ex. A did not reflect the parties' agreement that she could live on the real property, and that she had no discussion with Ken and David about paying rent or property taxes.

Ex. A is a copy, not an original document.  Charlotte testified that she discovered Ex. A five or six weeks before trial.  She testified that she first saw Ex. A in October of 1993, but did not see it again until looking through documents in a shed located on the property.  Charlotte testified that she found Ex. A in a box of David's resumes.  She testified that she gave it to David who gave it to his attorney.  David admitted that he did not refer to Ex. A when he was interviewed by Plaintiffs' counsel.  David testified that he believes Plaintiffs have the original because he did not get it back.[30]  As on Ex. 5, no authorized signature is evident on Ex. A by or on behalf of D-K Rentals.

**Lund's Expert Testimony Re:  Ex. A.**

Brett Lund is a private investigator and forensic document examiner with 16 years experience specializing in handwriting analysis.  Defendants' counsel stipulated that Lund is qualified to testify as an expert.  Lund's report, Ex. 10, was admitted into evidence over their

---

[30]No motion to compel production was filed before trial by Defendants.

objection.

Plaintiffs' counsel contacted Lund regarding Ex. A, the "Questioned Document" in which Lund explained the author on a page or pages of a document is unknown or questioned. Lund testified that he requested and was provided with handwriting exemplars[31] of James ("David Sr."), Pat, and Debra, and that he examined those and Ex. A on February 26, 2008. Semansky informed Lund that the signatures of James, Debra and Pat were at issue, that Ex. A was a copy, and that James was deceased.

Lund explained that in analyzing handwriting he looks for individual characteristics or styles which have developed, the size and slant of letters and numbers and where they appear with respect to any baseline. Lund identified three methods people use to try to copy or forge signatures: (1) trying to duplicate a signature after practicing; (2) tracing or drawing over the top of a signature using backlighting; and (3) cutting or pasting either with a computer program lifting a signature off of the page, or by physically cutting and pasting a signature and making a new copy of the document.

Lund examined the questioned signatures of James, Pat and Debra on page 2 of Ex. A and compared them with the exemplars. Ex. 10, fourth page. He testified that James' and Pat's exemplars came from their bankruptcy documents. Lund testified his conclusions, from Ex. 10 pages 2 and 3, and his opinion that James' and Pat's questioned signatures on Ex. A were "exact mirrored image" of their known signatures. Lund testified that he held James' and Pat's signatures up to backlight and could see the same beginning and end strokes. Lund testified that

---

[31]Lund explained that he wants exemplars in "free and natural handwriting" to perform handwriting analysis.

he increased the size of the questioned signatures of James and Pat on Ex. A by five percent because they appeared slightly smaller, and he concluded that their questioned signatures were exact duplicates of the exemplars from James and Pat's known signatures from October 30, 1987.  Ex. 10, p. 2.

With respect to Debra's signature on Ex. A, Lund testified that he compared the questioned signature with Debra's exemplars dated 2-19-08 and 5-24-93, Ex. 10, fourth page, and he saw different slants and ending strokes.  He testified that the exemplars from 2-19-08 and 5-24-93 are pretty much the same, and he concluded that with respect to the questioned signature of Debra, "it does not appear that the authors are the same."

On cross examination Donahue asked whether Lund could figure out what result Semansky wanted for the Plaintiffs, and Lund testified that Semansky wanted him to provide analysis of the questioned signatures and that he gave a fair analysis.  Lund did not agree with Donahue's suggestion that his business would suffer if he did not provide Plaintiffs with a favorable analysis.

Donahue asked Lund whether James and Pat's questioned signatures were exactly the same as the exemplars, and Lund repeated his opinion that they are exactly the same.  Donahue provided Lund with enlarged copies of James' questioned and exemplar signatures, Ex. U, and asked Lund about the "J" crossing the signature line on the exemplar, but not on Ex. A.  Lund disagreed that they were not the same and pointed out that Ex. U consists of copies.  Donahue asked Lund if he agreed that the loop of the "J" on Ex. U was squashed flat for the questioned signature and "nice and round" on James exemplar, and Lund answered "No."  Donahue asked Lund twice more whether the loops in the "J" on Ex. U were the same, and Lund testified:  "My

26

testimony is these are exactly the same."

Donahue asked Lund about the "x" preceding James' signature on both the exemplar and questioned signature, and the fact that on the exemplar the "x" crosses the signature line while on the questioned signature it does not. Lund answered that the rest of the "x" is the same and some of the line may have been cut off when it was cut and pasted. Donahue asked how a signature line could have been removed in 1993 and then added back in. Lund testified that it could be cut out, erased with an eraser or whiteout, or by using a computer program, and that he would be able to tell if he had the original Ex. A.

Donahue suggested that there is a different angle in the tail of the "s" at the end of James' questioned signature and exemplar, and Lund testified "I see an exact replica of that." Donahue asked about the main stroke of the "J" being a different angle in James' questioned and exemplar signatures. Lund responded that he looks at the angle and the style of the letters in his analysis, and that an angle can be changed when cutting and pasting, but Lund testified that the "J" was not off angle between the two.

With respect to Pat's questioned and exemplar signatures of the fourth page of Ex. 10, Donahue suggested that the big loop in the "P" does not match up. In response Lund testified "I disagree" and "They are exactly the same."

With respect to Debra's signatures, Lund agreed that it is possible that persons may have a motivation to conceal their handwriting. When asked about Debra's exemplars, Lund testified that they are all the same. Ex. V includes additional examples of Debra's signature. Lund testified that he had not seen Ex. V prior to his testimony. After reviewing Debra's signatures on Ex. V Lund testified that it contains different variations of Debra's signature. However, Lund

testified that he looks at the construction of the letters in signatures and not just the slant, and he testified that the letters in Debra's questioned signature on Ex. A are not the same as Debra's exemplars.

Lund's opinion testimony and Ex. 10 corroborate Pat's and Debra's testimony that they did not sign Ex. A.  Defendants' counsel stipulated that Lund is an expert, and Defendants did not call an expert witness of their own to refute Lund's opinion.  No evidence exists in the record that Pat, Debra and James signed Ex. A, except for Ex. A itself, and it is a copy not an original.

In addition the "Statements" of Debra, James and Pat on the first page of Ex. A, are inconsistent with the other evidence admitted at trial.  Ex. A states that "Debra realized an incredible amount of money for her 10% interest and for little or no work", and that James and Pat "have compensated themselves lavishly with funds from D-K AZ.  They too contributed little or no work."  Given the testimony describing James as "headstrong," and Debra's and Pat's denials that they read or agreed with such statements, it is not credible that James would submit to David's demand that he sign Ex. A and obtain Pat's and Debra's signature on Ex. A, especially after Ken and David resigned as officers, directors and shareholders of D-K Rentals two weeks earlier.

Based on these factors, the Court accepts Lund's opinion and conclusions.  The Court finds and concludes that the signatures of Pat, James and Debra on Ex. A are forgeries, and that Ex. A is a sham.

**After the Resignations.**

Pat and James continued to live in their house after Ken's and David's resignations. Debra denied that Ken and David had an agreement with their parents that they could live on the

28

real property in exchange for paying for maintenance and taxes.  Debra testified:  "There was no agreement that my parents were only to be caretakers of their own place."  Debra testified that her parents never paid rent to D-K Rentals, but that they worked for the corporation for several years without being paid.  Debra stated her position that, since she never resigned like David and Ken did, any dispute regarding the real property is between her and her parents.

D-K Rentals was involuntarily dissolved in Montana in 1994.  Pat testified that one annual report was filed for D-K Rentals in Montana after Ken and David resigned, which listed Debra and "maybe" James and Pat as officers and directors.

Koontz provided accounting services for James and Pat, including a statement of their financial condition dated May 6, 1996, Ex. I.  Ex. I states their net worth as $1,070,385.00, with no liabilities.  The notes to Ex I list an investment in D-K Rentals at page I-3 on Note 2, which states "James and Patricia Kraus own all of the outstanding common shares of D-K Rentals & Contracting, Inc."  Koontz testified that James and Pat told him that they owned all the shares of D-K Rentals[32].  Pat testified that she believed she owned D-K Rentals, except for Debra's ten percent share, and that she and James acted as owners of the real property.  Pat also testified that she asked Koontz about the shares and learned that the number of shares did not change, so Debra was the only officer remaining after Ken and David resigned.

 The value of the D-K Rentals' assets on Ex. I-3 is $705,576.00[33], all of which Koontz testified was acquired not later than 1993.  Pat testified that Koontz was aware of the value and

---

[32]On cross examination Koontz admitted that if the information given to him by his clients is wrong, so is his conclusion.

[33]The $705,576 total assets on Ex. I-3 include a $125,000 note receivable which Koontz testified arose from a loan to a borrower in Fort Shaw or Sims.

would not have just used a figure she stated[34].  On page I-2 the $705,576 is described as James' and Pat's "Investment" in D-K Rentals.  Under cross examination Pat was asked to admit that it was not true that D-K Rentals was her asset and she insisted that it was, and that the D-K Rentals property was to be given to her by family agreement.  Ken testified that he did not intend to walk away from his 45% interest in property worth $705,576.

On cross examination Pat described the family agreement as that she and James were allowed to live on the corporate property without paying rent.  Pat admitted that she stated in her deposition that she would pay for the taxes and upkeep on the real property in return for being allowed to live there.[35]

Koontz also prepared a tax return for the year 1993 for D-K Rentals in September 1996, which he testified he gave to James or Pat.  He testified that his clients had not provided him with the necessary information to prepare the turn until 1996.  Pat testified that she reviewed D-K Rentals' 1993 tax return in 1996, and that was the last tax return filed for D-K Rentals.

Debra testified that she incorporated a third D-K Rentals entity, D-K Rentals LLC, herself in 1998.  That third D-K Rentals entity lasted about a year and was also involuntarily dissolved.

By 2004, Debra testified, D-K Rentals owned a few pieces of equipment she described as "junk" and the real property consisting of approximately 40 acres including the house where James and Pat lived before James died.  Debra testified that she and her mother have

---

[34]Pat testified that the $705,576 value was a little high and she thought it was closer to $500,000 to $600,000 in value.  She testified that from 1993 to 1996 all property in the vicinity of D-K Rentals' real property appreciated in value.

[35]At trial Pat testified that she did not think about it when she stated at her deposition that she agreed to pay the property taxes and upkeep.

homeowners insurance on the house in which they live on the real property, because Pat owns the house and renters insurance would not have covered the structure.  She testified that Pat kept the house insured when she was able, and that they requested that Ken and David get insurance because business was being conducted in the shop located on the property.

Pat testified that after Ken and Ken resigned in 1993, D-K Rentals had one contract with the City of Great Falls.  Pat testified that the Great Falls contract was for approximately $55,000 and resulted in a profit of less than ten percent or $5,500, which is reflected in D-K Rentals' tax returns, that all D-K Rentals' income ended in 1999, and that the corporate equipment was all sold and the only corporate property remaining is the real property[36].  Pat testified that she closed the corporate bank account perhaps in 1999 after the corporate money had all been used up.

Pat testified that prior to 1999 she and James used corporate funds to pay property taxes and maintenance on the garage, but she denied using corporate funds to pay utilities and home insurance or for maintenance on the real property.  She testified that she improved the real property after 1993 by replacing the roof on her house, replacing windows, installed a new well, pipe and septic system, leveled the property, built fences, and began repairs on the shop roof. She also entered into an agreement with the State for reclamation of part of a gravel pit on the property, and had some cattle on the property one year after 1993.  Pat testified that, in addition to raising cattle, during one season James grew a hay crop one year which yielded a total of 3 or 4 bales of hay from dry land production worth $300.

Pat denied selling corporate equipment.  When impeached with her deposition testimony that she sold equipment, Pat testified that the ownership of the equipment was in question.  That

---

[36]Pat and Debra have their own personal property and vehicles on the real property.

equipment sale generated approximately $36,000 in proceeds, which Pat testified was used to pay for taxes and maintenance. Ex. D are sales receipts for the sale of equipment by Pat over the last several years by an equipment seller, GAM Enterprises, Inc., with the proceeds checks made out to Pat[37]. Of the equipment listed as sold on Ex. D, Pat testified that at one time a tire loader listed on Ex. D-5 was D-K Rentals equipment but was junk[38]. Pat testified that she sold gravel from the corporate real property during the last 5 or 7 years, and that the proceeds went to pay corporate bills and taxes. After 1999, Pat testified, she paid for the taxes and maintenance on the property out of her own pocket in return for free rent.

Ken and his spouse filed the above-captioned Chapter 7 bankruptcy petition on December 3, 2001[39]. Ken testified that he did not list any ownership interest in D-K Rentals in his Schedules, even through his attorney told him to disclose everything. He testified that it was a mistake not to list his ownership interest, and that he understands that his interest in D-K Rentals may be property of the estate.

On June 30, 2005, Ken signed the corrected corporation quit claim deed, Ex. 1, representing that he was D-K Rentals' president and transferring the real property to himself. Ex.

---

[37]The name on the checks on Ex. D is Pat McGraw, which Pat testified is her name.

[38]Ex. D-5 lists a Terex 72-31 wheel loader sold for $6,500. The date on the sales receipt is 2-26-07. On redirect examination by her attorney, Pat went through all the equipment listed on Ex. D. She testified that, except for the wheel loader, all the items of equipment on Ex. D were owned by James and Pat. She testified that the $6,500 sale price for the wheel loader on D-5 was much less than she and James spent to repair it, with no contribution from D-K Rentals.

[39]The Trustee in Ken's Chapter 7 case filed a no-asset report. A discharge was entered and the case was closed. The U.S. Trustee moved to reopen alleging undisclosed property. The case was reopened. The Trustee filed an application to employ an attorney and an asset notice and request for claims bar date.

1 was recorded on July 1, 2005, in Cascade County records.  Debra testified that she had no

discussion with Ken about the transfer prior to Ex. 1, that she had not resigned as corporate

officer and director of D-K Rentals and that she did not authorize Ken to transfer the real

property to himself.

Ken testified that he quitclaimed the real property before it got sold by Debra[40].  Ken

testified that, after he transferred the real property to himself, a fire broke out on the property

which burned a neighbor's crop.  He testified that the neighbor was told to go see Ken because

Ken owned the property, and Ken's insurance paid for that claim.

At trial Ken conceded that he should not have quitclaimed the property and he admitted

that the real property still was owned by D-K Rentals.

Debra testified that when the property taxes became due for two acres of the subject real

property they discovered that a huge tax debt had accrued.  Ex. H is the tax records for the parcel,

which names Ken as the owner and taxes due since 1991 in the total amount of $56,832.41 as of

6/7/2007[41].  Pat testified that one parcel was over assessed and that other parcels paid less in

taxes[42], and that they went to the county assessor's office to protest and try to negotiate with the

Cascade County Treasurer about reducing the assessment on the overdue property taxes, which is

---

[40]Ken was concerned about what he described as Debra's current husband's history of
taking advantage of women to get their property.

[41]Pat admitted that the property taxes, interest and penalties continue to mount.

[42]She testified that she and James had paid property taxes on parcels other than those they
had protested, and that the taxes on the other 38 acres of the real property are current.  Pat was
asked on cross examination about whether she produced tax receipts.  She answered that she has
receipts but was not asked to produce them.  No motion to compel production of discovery has
been filed by the Defendants.

when they learned from the public records that Ken had transferred title to the real property to himself by means of Ex. 1.  Pat said they were not making any headway, and they ceased their efforts to resolve the unpaid taxes and have paid none since 1991.

Debra testified that she returned to Montana after James had a second stroke to take care of him.  While in Montana she received a divorce which became final in 2007.  In her divorce Debra was served with discovery requests, and her responses dated November 7, 2005, were admitted as Ex. N.  In Ex. N Debra answered interrogatory no. 16, asking for a list of all property that she owned an interest in at the time she was married, and she listed Eden Park Lane in Great Falls.  But Debra answered "None" to interrogatory nos. 10 and 11 asking to list real property and other marital assets and her separate property.  Interrogatory nos. 13 and 14 on Ex. N ask whether Debra is the officer and director in any corporation or if she has an ownership interest in any corporation.  Debra responded that she is not an owner, officer or director, "of any active Corporation."  When asked why she limited her answer to only "active" corporations Debra testified she did not know, and that by that time Ken had already put the real property and all other corporate assets in his personal name by means of Ex. 1 the previous June, and so her attorney advised her to list no interest.

Debra answered three requests for production of records on Ex. N indicating income, and corporate financial statements from 2001 to the present by stating "Not applicable".  Debra testified that she answered "Not applicable" because there was no income being generated by D-K Rentals, and no business taking place.  Under cross examination Debra admitted that her responses may have been inaccurate, but that she followed her attorneys' advice and did not list interests because Ken put the real property into his own name.

34

Debra admitted telling his nephew and his partner that she had no personal interest in D-K Rentals' assets, but that she has always maintained that the real property was to take care of Pat and James.

Plaintiffs filed this quiet title action in state court, signed December 21, 2005, and an amended complaint on or about May 11, 2006. The Trustee in Ken's Chapter 7 case, Darcy J. Crum, filed on May 1, 2007, a notice of removal of the action to this Court, based on Ken's allegations that he is the owner of the real property and officer and director of D-K Rentals. Docket No. 1. The Trustee's notice claims that Ken's interest in the D-K Rentals properties constitutes property of the estate, and consents to this Court's entry of final order or judgment in all matters. David intervened in this adversary proceeding in August 2007.

**Emotional Distress & Damages.**

Debra testified that since this lawsuit began she has had difficulty sleeping, that people have been calling her place of employment and following her for 3 years, and sending anonymous letters to her creditors. The persons Debra named as following her are not named party-defendants in this action. Debra testified that they had been a close family, and that the lawsuit has taken an emotional toll on them all.

Debra testified that there is other litigation between family members. Her current spouse filed a claim against Ken.[43] Pat testified that Debra tried to get a restraining order, but Pat chose not to be a party to that action and no restraining order was issued.

---

[43]That litigation involved an injury to a minor child family member from a personal watercraft accident before Ken filed the quit claim deed. Debra testified that others tried to get Pat to testify against Debra's spouse Rodney alleging that he was drunk during the accident. Pat testified that she was told to order Debra and her spouse to leave Pat's house.

35

Pat testified that her water has been shut off twice, and also the water to the shop and her animals have been shut off, and the ladder removed from her well.  But she could not identify who shut the water off[44].  Pat testified that she received numerous threatening phone calls from Charlotte Kraus, Kenneth James Kraus and anonymous callers, and that she was called names and given the "Number One signal" at various times.  Pat testified that before the transfer she worked as an insurance agent until she was dismissed when a complaint was filed against her for falsification by Ken's attorney Donahue.  She testified she now has cancer.

## DISCUSSION

### I.  QUIET TITLE

#### A.  Contentions

Plaintiffs seek that title of the real and personal property of the dissolved corporation D-K Rentals be quieted in Debra's name as sole director, officer and shareholder[45].  Debra argues that she is the sole director and officer of the dissolved corporation and under Montana law, MONT. CODE ANN. ("MCA") § 35-1-935(1) must wind up and liquidate its affairs and she must pay its taxes and distribute the remaining assets.  Plaintiffs argue that Ex. A is a fabrication containing their forged signatures, and that Ken and David resigned and walked away from the corporation and its assets and debts, as shown by Ken's failure to list any interest in D-K Rentals in his bankruptcy schedules.  Plaintiffs argue that the quit claim deed signed by Ken, Ex. 1, is void, and

---

[44]She testified that Ken, David and Kenneth James Kraus were the only ones who knew how to operate the well pump.

[45]In the Pretrial Order Plaintiffs argued in the alternative that title to the properties could be quieted alternatively in Debra's name or in the names of Pat and the decedent on the basis of prescriptive ownership.  In their pretrial memorandum Plaintiffs requested title be quieted in Debra's name.

that therefore the properties remain in D-K Rentals' name and title should be quieted to Debra under MCA § 35-6-104(5) to be held in trust while winding up the corporation's affairs.

Defendants contend that the corporate property belongs to D-K Rental of which they each own 50%. They ask for dismissal of Pat's claim based on her admission that she has no interest in D-K Rentals or the real property

### B. Quiet Title.

Plaintiffs cite MCA § 70-28-101, *et seq.*, as the basis for their quiet title action. Section 70-28-101 provides:

> **Quiet title action authorized.** An action may be brought and prosecuted to final decree, judgment, or order by any person or persons, whether in actual possession or not, obtaining title to real estate against any person or persons, both known and unknown, who claim or may claim any right, title, estate, or interest therein or lien or encumbrance thereon adverse to plaintiff's ownership or any cloud upon plaintiff's title thereto, whether such claim or possible claim be present or contingent, including any claim or possible claim of dower, inchoate or accrued, for the purpose of determining such claim or possible claim and quieting the title to said real estate.

Montana courts have jurisdiction to quiet title to real estate under MCA § 70-28-101. *Getter v. Beckman* (1989), 236 Mont. 377, 380, 769 P.2d 714, 716.

### C. Ownership of the Real Property.

The Court held at the conclusion of the trial, based on Ken's admission, that the real property belongs to D-K Rentals. Agreed fact 3 establishes that the real property was transferred to D-K Rentals by the bankruptcy estate of Pat and James. Ex. 1 is invalid and Ken testified that the real property remains property of D-K Rentals.

Pat and James were allowed to live in their house on the real property by agreement of the family while it remained property of the corporation. Montana's statute of frauds, MCA § 70-20-

37

101 requires transfers of real property to be in writing:

> No estate or interest in real property, other than an estate at will or for a term not exceeding 1 year can be created, granted, assigned, surrendered, or declared otherwise than by operation of law or a conveyance or other instrument in writing, subscribed by the party creating, granting, assigning, surrendering, or declaring it or by his lawful agent thereunto authorized by writing.

No writing exists in the record conveying the real property to Pat and James, including no writing evidencing a gift. While discussions occurred between Koontz, Ken, David and Bronson about gifting the property to James and Pat, no gift tax returns were filed. In the absence of a writing, Pat's claim of ownership in her house is barred by the statute of frauds.

Pat claims a prescriptive ownership in the house where she resides. Montana case law provides:

> A title acquired by prescription is sufficient against all, § 70-19-405, MCA, and our statutes recognize two ways for the acquisition of such title. One may claim adverse use founded on an instrument or judgment. Section 70-19-407, MCA, or by actual occupancy under claim of title not founded on an instrument or judgment. Section 70-19-409, MCA. The difference seems to be that occupancy under a claim founded on instrument or judgment, subject to statutory limitations, will provide title to the whole tract, whereas occupancy under a claim not founded under an instrument or judgment gives title only to the land actually occupied.

*Mielke v. Daly Ditches Irr. Dist.* (1987), 225 Mont. 172, 178, 731 P.2d 927, 931.

Pat's claim of prescriptive ownership is not founded on an instrument or judgment. No writings were produced showing a gift or other conveyance. Pat has not actually occupied the house under claim of title. Rather she, Debra, Ken and David all agreed that she and James were permitted to live in their house, without having to pay rent. On Ex. I, Koontz listed James' and Pat's interests in the house and real property as an investment in D-K Rentals, not that they have title to the real property in their own names. The Court finds that Pat has failed her burden of

proof to show ownership of the real property by prescription, and title to the real property is in the name of D-K Rentals.

### D.  Ownership of D-K Rentals.

The articles of incorporation, Ex. 2, provide that D-K Rentals is incorporated under MCA § 35-1-112, *et seq.*, the "Montana Business Corporation Act" ("MBCA"). In determining the rights of the parties to the corporate property, the Court refers to the provisions and definitions provided in the MBCA.

Ken and David contend that they each own 50% of D-K Rentals. No evidence exists in the record to support that contention. Originally Ken and David owned 45% of D-K Rentals shares each, and Debra owned the other 10%. Ken and David seek to strip Debra of her 10% interest in D-K Rentals without compensation, and without offering any legal theory to deprive her of her property. Their claim for 50:50 ownership in D-K Rentals is without support in law or fact. David's own evidence, Ex. 2, which is signed by Ken, establishes that Debra is an officer of D-K Rentals, and the testimony is uncontroverted that she was a shareholder in D-K Rentals in Arizona and that did not change when D-K Rentals was incorporated in Montana. David testified that Debra had 10% of D-K Rentals, but he asserted that she already got what she had coming. That argument lacks merit.

Ken and David resigned from the corporation, in consultation with the corporation's attorney Bronson. Ex. 3 and 4 provide with respect to Ken and David: "I hereby resign from all officer and director positions with the corporation, pursuant to Sections 35-1-423 and 35-1-444, MCA. I will have no further interest or involvement in the corporation." The first sentence of Ex. 3 and 4 provides for Ken's and David's resignations as officers and directors of D-K Rentals.

39

If the second sentence, "I will have no further interest or involvement in the corporation[,]" is not given additional effect then the Court would be omitting what was inserted. The Court may not ignore the entire document. MCA § 1-4-101 provides:

> **Role of the judge – preference to construction giving each provision meaning.** In the construction of an instrument, the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted. Where there are several provision or particulars, such a construction is, if possible, to be adopted as will give effect to all.

*Anderson v. Stokes*, 2007 MT 166, ¶ 46, 338 Mont. 118, 136, ¶ 46, 163 P.3d 1273, 1286, ¶ 46.

Applying § 1-4-101 and giving effect to all of Ex. 3 and 4, in this Court's review, the second sentence of Ex. 3 and 4 means that, in addition to resigning as officers and directors, Ken and David were waiving and renouncing any further "interest or involvement" in D-K Rentals, including their interests as shareholders.

Under MCA § 1-4-106: "The language of a writing is to be interpreted according to the meaning it bears in the place of its execution unless the parties have reference to a different place." The instant case involves no "different place" than the place of execution referenced in Ex. 3 and 4.

"'Share' means the unit into which the proprietary interests in a corporation are divided." Mont. Code Ann. § 35-1-113(22). "Interest" is not defined in the MBCA, but is itself used as a term in the definition of "share"[46] Basic provision of statutory construction in Montana includes MCA § 1-2-106:

> **Construction of words and phrases**. Words and phrases used in the statues of

---

[46]"Interest" is also part of the definition of "conflicting interest" in MCA § 35-1-461(1) and (2), without further elaboration.

Montana are construed according to the context and the approved usage of the language, but technical words and phrases and such others as have acquired a peculiar and appropriate meaning in law or are defined in chapter 1, part 2, as amended, are to be construed according to such peculiar and appropriate meaning or definition.

"Interest" is defined in BLACK'S LAW DICTIONARY 950 (4th ed. 1951) as: "The most general term that can be employed to denote a property in lands or chattels. . . . More particularly it means a right to have the advantage accruing from anything; any right in the nature of property, but less than title; a partial or undivided right, *a title to a share*." (Emphasis added). Ken and David argue that they did not intend to relinquish their interests in the value of the real property when they resigned from D-K Rentals. However, Ex. 3 and 4 are clear, "I will have no further interest or involvement in the corporation[,]" and they are dispositive of David's and Ken's claims of interests in D-K Rentals, or in the value of its real property.

In the construction of terms, MCA § 1-4-107 provides:

**Construction of terms**. The terms of a writing are presumed to have been used in their primary and general acceptation, but evidence is nevertheless admissible that they have a local, technical, or otherwise peculiar signification and were so used and understood in the particular instance, in which the agreement must be construed accordingly.

*Martin v. Laurel Cable TV, Inc.* (1985), 215 Mont. 229, 233, 696 P.2d 454, 457. MCA §1-4-102 provides:

**Consideration of circumstances surrounding execution**. For the proper construction of an instrument, the circumstances under which it was made, including the situation of the subject of the instrument and of the parties to it, may also be shown so that the judge is placed in the position of those whose language the judge is to interpret.

Construing MCA § 1-4-102, the Montana Supreme Court held:

[W]e hold that "the circumstances under which [an instrument] was made,

41

> including the situation of the subject of the instrument and of the parties to it," §
> 1-4-102, MCA, may be shown and considered to aid the court in determining, as a
> preliminary matter, whether the instrument contains an ambiguity.  We
> emphasize, however, that not all "circumstances" are admissible for this purpose.
> As stated earlier, an instrument does not contain an ambiguity simply because the
> parties have or suggest opposing interpretations thereof or disagree as to whether
> the language is reasonably open to just one interpretation. Rather, the
> determination of whether an ambiguity exists in a contract is made on an objective
> basis.

*Mary J. Baker Revocable Trust v. Cenex Harvest States, Cooperatives*, 2007 MT 159, ¶ 53, 338

Mont. 41, 64, ¶ 53, 164 P.3d 851, 866, ¶ 53.

The Court finds that Ex. 3 and 4 contain no ambiguity, after considering Ex. 3 and 4 in

the context of Ken's and David's negotiations with Koontz and Bronson, as well as the other

documents they executed.  Bronson prepared Ex. 5 in consultation with Ken and David.  The first

recital on page 1 of Ex. 5 removes any doubt of David's and Ken's "desire to withdraw from the

corporation, *in their capacities as shareholders*, directors, and officers."  (Emphasis added).  Ken

and David signed Ex. 5 at or near the time they signed Ex. 3 and 4, and together they were sent to

Pat by Bronson with Ex. 12 on October 1, 1993.

Since Ex. 3 and 4, which Ken and David signed, are drafted so broadly that they "will

have no further interest or involvement in the corporation," the Court cannot discern what legal

theory they rely on to claim residual rights in the value of D-K Rentals' assets.  Since they were

not shareholders after their resignation in Ex. 3 and 4, they lack standing to commence or

maintain a derivative proceeding since they were not shareholders of D-K Rentals at the time of

the act or omission complained of, under MCA § 35-1-542(1), after they signed Ex. 3 and 4.

Shares are governed in the MBCA under MCA § 35-6-618, *et seq*.  D-K Rentals' articles

of incorporation, Ex. 2, provide the corporation with the authority to issue shares of stock.  MCA

42

§ 35-1-620(1) provides for such issuance of stock and also for the "reacquisition, redemption, or conversion" of outstanding shares and that shares may be "canceled."  Additional authority governing acquisition of its own shares is provided under MCA § 35-1-630, which provides in pertinent part:

> (1) Except as provide in subsection (2), a corporation may acquire its own shares, and those shares constitute authorized but unissued shares.
>
> (2) if provided by the corporation's articles of incorporation or bylaws, shares acquired pursuant to subsection (1) constitute authorized and issued shares.  A corporation may at any time, by resolution of its board of directors, cancel all or any part of the shares acquired under this subsection, in which case the shares constitute authorized but unissued shares.

Nothing in Ex. 2, the articles of incorporation, prohibits D-K Rentals from acquiring its own shares, and MCA § 35-1-630(1) authorized D-K Rentals to acquire Ken's and David's shares.  Bronson testified that it was Ken's and David's intention when they signed Ex. 3 and 4 to end their involvement in the corporation.  They bound themselves to "have no further interest or involvement" in D-K Rentals, which this Court concludes under MCA § 35-1-630(1) meant that D-K Rentals reacquired their shares.  Since they resigned also as officers and directors, Debra was the sole remaining officer and director authorized "at any time" by MCA § 35-1-630(2) to cancel their shares.  Since Ken and James are no longer officers, directors, or shareholders of D-K Rentals their claims for an accounting, rent[47], and for conversion of corporate property are without merit as they have no standing.

Thus having no legal interest in D-K Rentals under Montana law after they resigned by means of Ex. 3 and 4, Ken and David have not articulated a legal theory to support their

---

[47]No evidence at trial, including Ex. A, provides any support for their claims for rent.

contention that they did not intend to surrender the "value" of D-K Rentals' real property when they resigned. They cannot have it both ways. If they wished to retain control of the disposition of D-K Rentals' assets, Ken and David had voting control over 90% of D-K Rentals' shares, and Ken was president. They could have liquidated all the corporate assets, not just the equipment, in 1991 or in 1993, but chose not to for family concerns. "The law aids the vigilant before those who sleep on their rights." MCA § 1-3-218. Having made their choice and renounced their interests in D-K Rentals in Ex. 3 and 4, in return for their wages, vehicles, prepaid life insurance, tools, and indemnification agreements, Ken and David are left with no further remedy under the MBCA, or other Montana law to claim an interest in the increased value of the real property, unless under principles of equity discussed below.

### E. Equitable Considerations.

Fundamental maxims of jurisprudence equity are found at MCA § 1-3-101 *et seq.* Maxims of equity include: "Between those who are equally in the right or equally in the wrong, the law does not interpose." MCA § 1-3-215; "one seeking equity must do equity," *In re Marriage of Cox* (1994), 266 Mont. 67, 71, 878 P.2d 903, 906; and "[p]arties must not expect relief in equity, unless they come into court with clean hands." *In re Marriage of Burner* (1991), 246 Mont. 394, 397, 803 P.2d 1099, 1100; *Mitchell v. Leland Co.*, 246 F. 103, 107. (9th Cir.1917).

None of the parties in this adversary proceeding come into court with clean hands. Debra and Pat used corporate credit cards for non-corporate charges. Pat and James held themselves out as owners of the corporate property and corporate interests in Ex. I, and to the public, and used corporate funds for non-corporate activities such as raising cattle, selling gravel, and

44

purchasing a swather for a non-corporation job.  Pat's testimony was impeached regarding her sale of corporate equipment, and whether she ever stated she owned an interest in D-K Rentals. James repeatedly exposed D-K Rentals and his family to liability by taking foolish actions and failing to pay taxes.

For their part Ken and David interfered and exercised control over the corporation after resigning in Ex. 3 and 4 and receiving indemnification in Ex. 5.  Ken testified that he knows he was wrong to file the quit claim deed representing himself as president of D-K Rentals after his resignation.  Ken failed to list his asserted interest in D-K Rentals in his bankruptcy schedules signed under penalty of perjury.  David offered a document with forged signatures, Ex. A, into evidence in this adversary proceeding.  The Court finds that the parties have not come into court with clean hands, and therefore declines to award Ken and David any relief under principles of equity for their claims that they did not intend to waive or renounce their interests in the increased value of the real property[48].

Since Ken and David have no legal or equitable interests in the real property, the Trustee of Ken's estate likewise has no claim to the real property.  State law determines the legal or equitable interests of the debtor in property as of the commencement of the case, and the "bankruptcy estate succeeds to no more interest than the Debtor possessed or had, and the estate takes its interest subject to such conditions."  *Brandt v. Esplanade (In re Esplanade)*, 19 Mont. B.R. 162, 174 (Bankr. D. Mont. 2001) (quoting *In re McLouth,* 18 Mont. B.R. 493, 499, 257

---

[48]The increase in value of the real property likely is not what they hope.  Pat admitted that the valuation of the property in Ex. I is high.  The real property remains subject to a taxable gain according to Koontz, and Ex. H shows $56,832.41 in property taxes due as of 6/7/2007 which have not been paid and continue to accrue.

B.R. 316, 321 (Bankr. D. Mont. 2000), *aff'd.* 268 B.R. 244 (D. Mont. 2001)) (other citations omitted).

### F.  Effect of Dissolution.

D-K Rentals was involuntarily dissolved in 1994.  The general rule is that "[u]pon dissolution of a corporation, its assets are first to be used in the payment of the debts and claims against it and those remaining are then to be distributed among the stockholders. . . .  When a corporation is dissolved, its shareholders become the beneficial owners[49] of its property, and it is the duty of the liquidating trustee to pass legal title of the property to them."  19 Am.Jur.2d *Corporations*, § 2459 (2004).  The general rule applies in Montana under MCA § 35-6-104(5): "In the case of involuntary dissolution, all the property and assets of the dissolved corporation must be held in trust by the directors of the corporation and 35-1-938 through 35-1-942 or 35-2-729, whichever is appropriate, is applicable to liquidate the property and assets if necessary."  *In re Estate of James*, 2004 MT 314,¶ 12, 324 Mont. 24, 26-27, ¶ 12, 102 P.2d 12, 14, ¶ 12.

Debra admits that she is obliged under MCA § 35-1-935(1) as the sole director and officer of the dissolved corporation to wind up and liquidate its affairs, pay its taxes and distribute the remaining assets.  However, she failed to perform that duty for more than ten years before Ken quitclaimed the real property to himself, and it is now fourteen years since D-K Rentals was dissolved.

MCA § 35-1-935(1) provides:

Effect of dissolution.  (1) A dissolved corporation continues its corporate

---

[49]"The stockholders of a corporation, when its existence ceases, become vested with a legal title to its property as tenants in common, at least if all the debts have been paid and no receiver has been appointed.  19 Am.Jur.2d *Corporations*, § 2486.

existence but may not carry on any business except that appropriate to wind up and liquidate its business and affairs, including:

> (a) collecting its assets;
> (b) disposing of its properties that will not be distributed in kind to its shareholders;
> (c) discharging or making provision for discharging its liabilities;
> (d) distributing its remaining property among its shareholders according to their interests; and
> (e) doing every other act necessary to wind up and liquidate its business and affairs.

A dissolved corporation's property remains property of the corporate entity until it is distributed to creditors and shareholders. *State of Montana v. Debus*, 2002 MT 307, ¶ 26, 313 Mont. 57, 64, ¶ 26, 59 P.3d 1154, 1159, ¶ 26.

In this Court's view MCA § 35-1-935(1) does not authorize a dissolved corporation to delay indefinitely the winding up and liquidating of its business and affairs in order to avoid having to report a taxable gain, which appears from the record to be the only reason the real property was not liquidated, first by Ken and David and after dissolution by Debra. Debra was the sole remaining officer and director of D-K Rentals, as well as the sole remaining shareholder after Ken's and David's resignations. The Court finds that Debra failed to comply with her duty to wind up and liquidate D-K Rentals under MCA § 35-1-935(1)(a) when she failed to liquidate the real property as sole officer and director. Instead she and Pat continue to live on real property, and corporate assets were used for non-corporate activities which were incompatible with Debra's duty. "While the Montana Business Corporation Act does not specifically limit a director's use of corporate property to corporate purposes, the limitation is implied by the duties of good faith and care fundamental to a director's relationship to the corporation. *See* Section 35-1-418, MCA." *Debus*, ¶ 20.

47

The Montana Supreme Court explained a shareholder's interest in the property of a

dissolved corporation in *Debus*:

> Although a shareholder may have an equitable interest in corporate property, he or
> she has no legal ownership interest in corporate property.  Pursuant to Montana
> law, a corporation continues its corporate existence after dissolution and retains
> its assets until winding up is complete.  Section 35-1-935(1), MCA.  The
> shareholders of a dissolved corporation have a vested equitable interest in
> corporate property subject to creditor claims, but still do not have a legal
> ownership interest.  *See Belt v. Belt* (App. 1984), 106 Idaho 426, 679 P.2d 1144,
> 1150.  Once creditor debts are satisfied, the remaining assets are divided *pro rata*
> between the shareholders, at which point they have legal ownership interest.  19
> C.J.S. *Corporations* § 854 (1990).  Consequently, Virtual's shareholders had no
> ownership interest in the corporate assets until the creditors were paid and
> winding up was complete.

*Debus,* ¶ 32.

Pat and James never had an ownership interest in D-K Rentals, despite Pat's

representation to the accountant Koontz which was placed into their financial statements.  Ken

and David resigned as officers, directors, and shareholders, leaving Debra as the sole officer,

director and shareholder of D-K Rentals with the duty to wind up and liquidate its affairs.  Pat

and Debra testified that the corporate debts were paid in full no later than 1999.  Under MCA §

35-1-935(1)(d) and (e) Debra was obligated to distribute the remaining corporate property to

herself.  She failed to perform her duty, and the only evidence in the record as to why, before Ken

filed the quit claim deed, is the fact that the accountant Koontz advised her not to sell the

property to avoid a substantial tax.  That course of action was inconsistent with Debra's

obligation to wind up and liquidate the affairs of D-K Rentals in good faith.

The fact that the corporation's accountant warned Debra of a sizeable tax event in the

event of a sale of the property is no excuse for the now 14-year delay in liquidating the corporate

48

real property.  It created uncertainty[50] and a legal limbo in which latent family animosity

simmered until it boiled over, manifested in Ken's quit claim deed of the real property to himself,

Ex. 1, and this litigation.

Another maxim of equity provides:  "That which ought to have been done is to be

regarded as done, in favor of a person to whom and against a person from whom performance is

due."  MCA § 1-3-220; *In re Marriage of Lorge* (1984), 207 Mont. 423, 432, 675 P.2d 115, 119.

As sole remaining shareholder Debra is the person who is entitled to the distribution of the

corporate property, and as sole remaining officer and director she was the person from whom

performance was due to wind up and liquidate D-K Rentals' business and affairs.  By operation

of MCA § 35-6-104(5) and § 35-1-942(2)[51], this Court is empowered to wind up and liquidate

the corporation's business and affairs in accordance with § 35-1-935.  Applying MCA § 35-1-

942(2) to enforce Debra's compliance with MCA § 35-1-935(1)(a) after so much delay, this

Court deems it appropriate to enter Judgment quieting all right, title and interest in the real

property and personal property of D-K Rentals in its sole shareholder, Debra Purtle.

This result is consistent with the requirements of Montana law governing the dissolution

of corporations, is supported by the evidence showing that Ken and David resigned as officers,

---

[50]Ken's and David's contentions that they did not intend to give up the value of the real property when they resigned reflects an unrealistic view of its value.  When Pat and James placed the $705,576 value of their interest in D-K Rentals in Ex. I-3, while in fact they had no ownership interest, that value failed to take into account the tax gain which would result in any disposition of the real property.  The amount of that gain was never quantified at trial, but Koontz noted that it would be sizeable.

[51]Section 35-1-942(2) provides:  "After entering the decree of dissolution, the court shall direct the winding up and liquidation of the corporation's business and affairs in accordance with 35-1-935 and the notification of claimants in accordance with 35-1-936 and 35-1-937."  Section 35-6-104(5) applies § 35-1-942 to involuntary dissolutions by the secretary of state.

directors, and shareholders of D-K Rentals in Ex. 3, 4, and 5, and permits the intention of all of the parties that Pat be allowed to continue to live in her home be given effect.

The unknown taxable gain, which Koontz warned the parties about and caused them to delay liquidating and distributing the real property as required, is provided for under MCA § 35-1-937 ("Unknown claims against dissolved corporation.").  Section 35-1-937(1) provides in pertinent part that "the dissolution of a corporation, including by the expiration of its term, does not take away or impair any remedy available to or against the corporation or its officers, directors, or shareholders for any claim or right, whether or not the claim or right existed or accrued prior to dissolution."  *Allen v. Atlantic Richfield*, 2005 MT 281, ¶ 15, 329 Mont. 230, 235, ¶ 15, 124 P.3d 132, 135, ¶ 15.  MCA § 35-1-937(2) provides:

(2) A claim may be enforced under § 35-1-936[52] or this section:

(a) against the dissolved corporation, to the extent of the undistributed assets; or
(b) if the assets have been distributed in liquidation, against a shareholder of the dissolved corporation to the extent of the shareholder's pro rata share of the claim or the corporate assets distributed to the shareholder in liquidation, whichever is less, but a shareholder's total liability for all claims under this section may not exceed the total amount of assets distributed to the shareholder.

Under this section any claim for unpaid taxes resulting from the distribution of D-K Rentals' real and personal property to Debra may be enforced against her under MCA § 35-1-937(2)(b), as assessed by the appropriate taxing authorities.

## II. EMOTIONAL DISTRESS

Plaintiffs request damages for emotional pain and suffering, attorney fees and costs based on Defendants' harassment.  Defendants request that the Court reject Plaintiffs' claims for

---

[52]MCA § 35-1-936 provides for "Known claims against dissolved corporation."

emotional distress.

The Montana Supreme Court in *Winslow v. Montana Rail Link, Inc.*, 2001 MT 269, ¶ 12, 307 Mont. 269, 274 ¶ 12, 38 P.3d 148, 151 ¶ 12, cited the holding of *Sacco v. High Country Independent Press, Inc.* (1995), 271 Mont. 209, 239, 896 P.2d 411, 429, recognizing that an independent cause of action for negligent infliction of emotional distress will arise under circumstances where serious or severe emotional distress to the plaintiff was the reasonably foreseeable consequence of the defendant's negligent act or omissions. The court repeated that "[l]iability only arises when the emotional distress is 'extreme,'" and adopted that same standard for intentional infliction of emotional distress claims, and reaffirmed the requirement that the emotional distress suffered must be "serious or severe." *Winslow*, ¶ 12; *Sacco*, 271 Mont. at 237, 896 P.2d at 428.

This Court in *Miller v. Snavely*, 19 Mont. B.R. 300, 345-47 (Bankr. D. Mont. 2002) quoted *Sacco* and a later Montana case discussing severe and compensable emotional distress:

> The Supreme Court explained serious or severe emotional distress as:
>
> [I]t is appropriate to define "serious" or "severe" emotional distress by employing the Restatement (Second) of Torts definition of severe or serious emotional distress. (We note that, although the Restatement definition addressed the definition of serious emotional distress in the context of the tort of intentional infliction of emotional distress, we conclude that it is also appropriate to use that same definition in connection with negligent infliction of emotional distress.) The Restatement (Second) of Torts, § 46, comment j at 77-78 defines "serious" emotional distress as:
>
>> Emotional distress passes under various names, such as mental suffering, mental anguish, mental or nervous shock, or the like. It includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin,

51

disappointment, worry, and nausea. It is only where it is extreme that the liability arises. Complete emotional tranquillity is seldom attainable in this world, and some degree of transient and trivial emotional distress is a part of the price of living among people. The law intervenes only where the distress inflicted is so severe that no reasonable [person] could be expected to endure it. The intensity and the duration of the distress are factors to be considered in determining its severity. Severe distress must be proved....

The distress must be reasonable and justified under the circumstances, and there is no liability where the plaintiff has suffered exaggerated and unreasonable emotional distress, unless it results from a peculiar susceptibility to such distress of which the actor had knowledge.

*Sacco*, 271 Mont. at 233-34, 896 P.2d at 426.

A later case expanded on *Sacco*:

Measuring this element requires a careful consideration of the circumstances under which the infliction occurs, and the party relationships involved, in order to determine when and where a reasonable person should or should not have to endure certain kinds of emotional distress.

Thus, the very same descriptive terms that have been used to characterize compensable emotional distress in some circumstances have also described emotional distress that has been denied recovery. *Compare Zugg v. Ramage* (1989), 239 Mont. 292, 298, 779 P.2d 913, 917 (affirming emotional distress damages for "chest pains," worries over financial stability, and "sleepless nights" resulting from tortious misrepresentation in sale of resort) and *Niles v. Big Sky Eyewear* (1989), 236 Mont. 455, 465, 771 P.2d 114, 119- 20 (concluding that such evidence as a personality change and marital problems was sufficient to raise jury issue on negligent infliction of emotional distress) *with Lence v. Hagadone Inv. Co*. (1993), 258 Mont. 433, 444-45, 853 P.2d 1230, 1237 (concluding that evidence of one visit to a hospital emergency room "for stress and heart-related problems and circulatory problems" insufficient for recovery) and *McGregor v. Mommer* (1986), 220 Mont. 98, 111-12, 714 P.2d 536, 545 (concluding that financial problems resulting from tortious conduct, which "bothered" plaintiff "a lot" and "at

52

> times, it would show up at home," were not sufficiently serious to
> warrant jury instruction for emotional distress damages). *See also First
> Bank*, 236 Mont. at 206, 771 P.2d at 91 (disapproving of recovery for
> loss of sleep and nervous tension).

*Maloney v. Home and Investment Center, Inc.*, 2000 MT 34, 298 Mont. 213, 230-31, 994

P.2d 1124, 1135-36.

In the instant case Debra testified that she has had difficulty sleeping, that people have

been calling her place of employment and following her, and sending anonymous letters to her

creditors, and that the lawsuit has taken an emotional toll.  Pat testified that her water has been

shut off twice, and also the water to the shop and her animals, and the ladder removed from her

well, but she could not identify who did these things.  Pat testified that she received numerous

threatening phone calls from Charlotte Kraus, Kenneth James Kraus and anonymous callers, and

that she was called names and given the "Number One signal" at various times.

The persons Debra and Pat named as following, phoning and harassing them are not all

named party-defendants in this action.  Only Ken and David are defendants, and the Court cannot

hold Ken and David liable to Debra and Pat for emotional damages caused by non-parties

without a showing that Ken and David are behind the offensive conduct, which Debra and Pat

failed to show.  In addressing damages for emotional distress the court explained in *Sacco*:

"[D]amages for emotional distress are compensatory and, therefore, the focus should be on the

reasonable foreseeability that plaintiff's serious or severe emotional distress was the consequence

of the defendant's act or omission."  271 Mont. at 238, 896 P.2d at 428.

"It is for the trial court to determine whether the evidence supports a finding of severe

emotional distress.  *Sacco v. High Country Independent Press* (1995), 271 Mont. 209, 239, 896

P.2d 411, 429."  *St. John v. Missoula Elec. Co-op., Inc.* (1997), 282 Mont. 315, 321, 938 P.2d

586, 589.  It is necessary for the plaintiff to prove "that the emotional distress suffered is severe or serious." *Sacco* at 232, 896 P.2d at 425.  Concern that a party might be subjected to unlimited liability is alleviated by the necessity of  "demonstrating that plaintiff's serious or severe emotional distress was the reasonably foreseeable consequence of defendant's negligent act or omission." *Id.* at 232; *Nelson v. Hawkins*, 45 F.Supp.2d 1015, 1021 (D. Mont. 1999).  Based on Debra's and Pat's failure to show emotional damages caused by Ken and David, other than the fact that other family members engaged in some of the offensive conduct, the Court concludes that they have failed to satisfy their burden of proof for an award of damages for emotional distress.

### III.  ATTORNEY FEES

Plaintiffs seek an award of attorney fees and costs under Rule 11, Mont. R. Civ. P. and MCA § 37-61-421.  Plaintiffs contend that Defendants' contentions were not well grounded in fact and were done for the sole purpose of harassing Plaintiffs, incurring expense and multiplying the proceedings.  Plaintiffs argue that Defendants "took every opportunity to obstruct and avoid resolution of the issues in this case as well as taking positions that are not supported by law or facts to the end that this litigation has been protracted and cost considerably [sic]."  Defendants request that Plaintiffs claim for attorney fees be denied.

Section 37-61-421 provides:

> **Attorney's or litigant's liability for excess costs.**  An attorney or party to any court proceeding who, in the determination of the court, multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorney fees reasonably incurred because of such conduct.

*Lewistown Propane Co. v. Moncur*, 2003 MT 368, ¶ 17, 319 Mont. 105, 110, ¶ 17, 82

54

P.3d 896, 900, ¶ 17.

This adversary proceeding was removed to this Court by the Trustee, not by Ken and David. This proceeding appears to be the only proceeding between the parties involving the corporation's real property. In determining whether Defendants multiplied the proceedings unreasonably and vexatiously, the Court credits Defendants with conceding that the quit claim deed signed by Ken is invalid. With that concession, Plaintiffs' argument that Defendants multiplied proceedings unreasonably and vexatiously is reduced, because that matter was resolved without further dispute.

David's offer into evidence of Ex. A, a document with forged signatures, is more vexing as discussed below. On the other hand, as discussed above the Plaintiffs do not come into court with clean hands. Based on this record, the Court does not deem it appropriate to award Debra and Pat attorney's fees and costs based on § 37-61-421.

Plaintiffs also request attorney's fees and costs based on Rule 11. Rule 9011, F.R.B.P., is the bankruptcy equivalent of Rule 11, Fed. R. Civ. P. This Court construed Rule 9011 in *In re Morrow*, 17 Mont. B.R. 183, 189-90 (Bankr. D. Mont. 1998), where the Court noted that courts interpreting Rule 9011 rely on cases involving Rule 11, citing *Wolf v. Kupetz*, 118 B.R. 761, 767 (Bankr. C.D. Cal. 1990). Rule 9011(b) provides that by presenting a signed paper an attorney or unrepresented party is certifying that to the best of his or her knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

> (1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;
>
> (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or

reversal of existing law or the establishment of new law;

(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, is specifically so identified, are reasonably based on a lack of information or belief.

Upon finding a violation of Rule 9011 a court has wide latitude under Rule 9011(c)(2) in imposing sanctions, including monetary sanctions. *In re Wenk*, 296 B.R. 719, 728 (Bankr. E.D. Va. 2002). Rule 9011 sanctions are initiated by motion or on the Court's own initiative. Under Rule 9011(c)(1)(A), the moving party must comply with the "safe harbor" section which provides in pertinent part: "[A] motion for sanctions may not be filed with or presented to the court unless, within 21 days after service of the motion . . . the challenged paper . . . is not withdrawn or appropriately corrected." No evidence is in the record which shows that Plaintiffs made a demand to Defendants to comply with this section, and so Plaintiffs have not satisfied that requirement under Rule 9011. *In re Miller*, 20 Mont. B.R. 297, 328-29 (Bankr. D. Mont. 2003). Additionally, under Rule 9011(c)(1)(A) a bankruptcy court is required to conduct a separate hearing on a motion for sanctions under Rule 9011. *Id.*, at 329; *See In re Silberkraus*, 336 F.3d 864, 869 (9th Cir. 2003).

Under Montana law, the trial court has broad discretion to decide whether the factual circumstances of a particular case amount to frivolous or abusive litigation tactics. *Ponderosa Pines Ranch, Inc. v. Hevner*, 2002 MT 184, ¶ 31, 311 Mont. 82, 89, ¶ 31 53 P.3d 381, 386, ¶ 31; *Friends of the Wild Swan v. Department of Natural Resources & Conservation*, 2000 MT 209, ¶ 58, 301 Mont. 1, ¶ 31, 6 P.3d 972, ¶ 31. Ex. A was offered by David and included forged

signatures of James, Pat and Debra.  No evidence exists in the record that they signed Ex. A, and Debra's and Pat's testimony that they did not sign Ex. A is uncontroverted and corroborated by Lund's expert opinion.  Defendants offered no competing expert testimony on the genuineness of James', Pat's and Debra's signatures.

Ex. A was dated after Ken and David resigned as officers, directors and shareholders of Ex. A, and was not signed on behalf of D-K Rentals.  After all the trouble and expense incurred in relation to Ex. A, its probative weight was negligible, at best.  Ken admitted that he did not intend for Ex. A to supersede his resignation.  The incriminating statements attributed to James, Pat and Debra on page 1 render it unbelievable that they would sign Ex. A.  It served no purpose. In applying its discretion, the Court would award Plaintiffs attorney fees and costs under Rule 11 based on Ex. A, if the Defendants had offered testimony that they observed James, Pat and Debra sign Ex. A with what turned out to be forged signatures.  However the record does not include any evidence from Defendants vouching for the genuineness of James', Pat's and Debra's signatures, and because of the inequitable conduct of those parties, in a close call the Court deems it appropriate that the parties pay their own attorney fees and costs and to deny Plaintiffs' request for fees and costs under Rule 11.

The American Rule denies attorney's fees in the absence of contract, applicable statute, or other exceptional circumstances, and any exceptions to the American Rule are narrowly circumscribed.  *Travelers Casualty & Surety Co. of America v. Pacific Gas & Electric Co.,*  __ U.S. __, 127 S.Ct. 1199, 167 L.Ed.2d 178 (2007).  The rule in Montana was stated by the Montana Supreme Court in *Harding v. Savoy*, 2004 MT 280, ¶ 68-69, 323 Mont. 261, 277-78, ¶ 68-69, 100 P.3d 976, 986-87, ¶ 68-69 as follows:

The longstanding rule in Montana, also known as the American Rule, is absent a contractual or statutory provision to the contrary, attorney fees will not be awarded to the prevailing party in a lawsuit. *Pankratz Farms, Inc. v. Pankratz*, 2004 MT 180, ¶ 93, 322 Mont. 133, ¶ 93, 95 P.3d 671, ¶ 93 (citing *Erker v. Kester*, 1999 MT 231, ¶ 43, 296 Mont. 123, ¶ 43, 988 P.2d 1221, ¶ 43). In the present case, neither a statutory nor contractual basis for an award of attorney fees exists; however, in rare instances a district court may award attorney fees to an injured party under its equity powers. *Pankratz*, ¶ 93 (citing [*Foy v. Anderson* (1978), 176 Mont. 507, 511-12, 580 P.2d 114, 116-17.]

No contractual provision exists for attorney fees in the record. The Court has declined to award attorney fees and costs under MCA § 37-61-421. The Court does not consider the record in the instant case appropriate to award Plaintiffs attorney fees and costs under Rule 11 or its equity powers, because the Plaintiffs do not come into court with clean hands. The American Rule therefore applies and the parties shall be responsible for their own attorney fees and costs.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of this adversary proceeding pursual to 28 U.S.C. § 1334.

2. This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (E).

3. Plaintiff Debra Purtle satisfied her burden of proof by a preponderance of the evidence to show that the real property and personal property at issue in this adversary proceeding all is owned by the corporation D-K Rentals & Contracting, Inc. The quit claim deed recorded by Ken with the Cascade County Clerk and Recorder as Document R0107447 on July 1, 2005, is void.

4. Defendants Kenneth Kraus and David Kraus both resigned as officers, directors and shareholders of D-K Rentals in 1993. Under Ex. 3 and 4 they have "no further interest or involvement" in D-K Rentals. Defendants failed their burden of proof to show that they have any legal or equitable interest in the assets of D-K Rentals, or in the increased value of the real

property owned by D-K Rentals.

5.  Plaintiff Debra Purtle is the sole remaining officer, director, and shareholder of D-K Rentals.  Plaintiff Pat Kraus failed to show that she or her spouse, co-Plaintiff James Kraus, ever had an ownership interest or equitable interest in D-K Rentals or its assets by gift or otherwise.

6.  D-K Rentals was dissolved in 1994.  Under MCA § 35-6-104(5) all of D-K Rentals' property and assets were held in trust by Debra Purtle except as appropriate to wind up and liquidate its business and affairs under MCA § 35-1-935(1).  Debra Purtle has failed to fulfill her obligation under MCA § 35-9-935(1) in good faith and a timely manner.

7.  As sole shareholder of D-K Rentals, Debra Purtle is entitled to a distribution of all of D-K Rentals' property under § 35-9-935(1)(d).

8.  The Court may direct the winding up and liquidation of D-K Rentals affairs under MCA § 35-1-942(2) and § 35-1-935(1)(d) and (e), which includes quieting title to the real property and any remaining corporate assets in the name of Debra Purtle.

9.  Any unknown or unliquidated claim for taxes may be enforced against the Plaintiff Debra Purtle under MCA § 35-1-937(2)(b).

10.  Plaintiffs failed to satisfy their burden of proof for their claim for emotional distress by a preponderance of the evidence against the named Defendants.

11.  Plaintiffs failed to satisfy their burden of proof under F.R.B.P. 9011 and Mont. R. Civ. P. 11 by a preponderance of the evidence, in support of their claim for attorney fees and costs.

12.  Plaintiffs failed to satisfy their burden of proof under MCA § 37-61-421, by a preponderance of the evidence, in support of their claim for attorney fees for frivolous or

vexatious pleadings.  The award under MCA § 37-61-421 is discretionary and not mandatory. Under Montana's "American Rule," both sides are responsible for their own attorney's fees and costs.

**IT IS ORDERED** a separate Judgment shall be entered in favor of the Plaintiff Debra Purtle and against the Defendants Kenneth R. Kraus and David J. Kraus[53], as follows:

(1) all right, title and interest to the approximately 45 acres of real property of D-K Rentals and Contracting, Inc., a legal description of which is set forth on "Exhibit 1" attached to the amended complaint found at Docket No. 2 in the case docket for this adversary proceeding, attachment No. 14 "Amended Complaint", which shall be attached to the Judgment and incorporated by reference therein, as well as to all remaining personal property of D-K Rentals, shall be quieted in the name of Debra Purtle, subject to unknown claims against D-K Rentals for taxes which may be enforced against Debra Purtle under MCA § 35-1-937(2)(b).

(2) The quit claim deed recorded by Ken on July 1, 2005, with the Cascade County Clerk and Recorder as Document R0107447, is void.  A certified copy of this Court's Judgment with attached legal may be recorded with the clerk and recorder to void the recorded quit claim deed, Document R0107447.

(3) Co-Plaintiffs Pat Kraus' and James Kraus' claims for an ownership interest in the real and personal property of D-K Rentals shall be dismissed.

(4) Defendants' claims for an accounting, rent, and damages for conversion shall be dismissed.

---

[53]Under MCA § 70-28-109 ("Who bound by judgment"), only the persons provided under that section shall be bound by the Judgment ordered herein.

(5) Plaintiffs' claims against Defendants for emotional distress shall be dismissed.

(6) Plaintiffs' claims against Defendants for attorney's fees and costs under MONT. R. CIV. P. 11 and MCA § 37-61-421 shall be dismissed.  Each party shall be responsible for their own attorney's fees under Montana's "American Rule."

BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana